**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

```
*******************************************
In re:                                    *
                                          *
RICHARD BROOKS                            *   Chapter 13
     and                                  *   Case No.  03-20888
JACQUELINE BROOKS,                        *
                                          *
     Debtors                              *
*******************************************
RICHARD and JACQUELINE BROOKS,            *
                                          *
     Plaintiffs                           *   Adv. Proc. No. 05-2001
                                          *
     v.                                   *
                                          *
GENERAL MOTORS ACCEPTANCE                 *
CORPORATION,                              *
                                          *
     Defendant                            *
*******************************************
```

## MEMORANDUM OF DECISION

The debtors' complaint against General Motors Acceptance Corporation (GMAC) is before me for decision on a stipulated record. The complaint asserts that GMAC violated the automatic stay of 11 U.S.C. § 362(a)[1] and the co-debtor stay of § 1301(a) by refusing to release its lien on a 1994 Plymouth Voyager automobile co-owned by Jacqueline Brooks and her father, Stephen Lantz. Because neither the Bankruptcy Code nor the debtors' confirmed Chapter 13 plan requires GMAC to release its lien, judgment will enter in its favor.

---

[1] Unless otherwise indicated, all statutory sections cited are those of the Bankruptcy Reform Act of 1976, as amended ("Bankruptcy Code" or "Code") 11 U.S.C. § 101 et seq, up to, but not including, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub. L. 109-8).

**Background**[2]

Jacqueline and Lantz purchased a 1994 Plymouth Voyager in October 1998. They executed a Retail Installment Sales Contract (Contract) with the dealer, which then assigned all of its rights, including a purchase money security interest, to GMAC. GMAC properly perfected its lien in accordance with state law.

The debtors filed their Chapter 13 petition in June 2003, scheduling the Voyager with a $2,000 value. They listed GMAC as a secured creditor to the extent of the car's value and as an unsecured creditor for the remaining contract balance. GMAC received notice of the bankruptcy but did not file a proof of claim. Pursuant to § 501(c), the debtors filed a proof of claim on GMAC's behalf.

On August 20, 2003, the debtors' Chapter 13 plan was confirmed. It bifurcated GMAC's claim into a secured claim of $2,000 and an unsecured claim of $1,606.69. It provides general unsecured creditors a 5% dividend, but separately classifies GMAC's unsecured claim to receive a 100% dividend. Confirmation was followed by the debtors' motion to allow and disallow claims, which was granted in accordance with local procedures.[3] Despite several post-confirmation plan modifications, GMAC's treatment remains unchanged.

About a year after confirmation, the debtors moved for an order authorizing them to sell the Voyager free and clear of "liens, claims, encumbrances and other interests," and served a

---

[2] The parties have stipulated to all facts essential to today's ruling. See Stipulations of Fact, dkt. no. 29, dated November 4, 2005.

[3] In this district, plan confirmation generally occurs well before the claims bar date has passed. D. Me. LBR 3015-3(a). After the bar date, debtors file motions to allow and disallow claims, amending confirmed plans as necessary in the process. D. Me. LBR 3015-3(d).

notice of sale on GMAC at a post office box address in Manchester, N.H.    GMAC did not object.  Consequently, on November 1, 2004, I entered an order approving the sale.  There is no evidence that the sale occurred, but the parties agree that GMAC's secured claim was fully paid by the Chapter 13 trustee as of October 6, 2004.

On December 15, 2004, GMAC sent Jacqueline and Lantz each a "Notice of Intent to Report Negative Credit."  The notices stated, in full, "We have told credit bureaus about a late payment, missed payment, or other default on your account.  This information may be reflected in your credit reports.  This is not a collection notice."

Despite requests by the debtors' attorney, GMAC refuses to release its lien on the Voyager until its contract claim is fully paid.  The debtors continue paying under their confirmed plan.  They have not yet received their discharge.

## Discussion

The parties agree that the debtors' plan properly bifurcated GMAC's claim into its secured and unsecured components under § 506(a) and § 1322(b)(2).  It pays the secured claim in full, with interest, and separately classifies the unsecured claim so that it will be paid a 100% dividend - no doubt as a function of  Lantz's independent liability on the GMAC debt.  See 11 U.S.C. § 1322(b)(1) (permitting separate classification and treatment of an unsecured claim when an individual co-obligor is also liable).

**1. The Allowed Secured Claim.**

At what point during the prosecution and execution of the debtors' Chapter 13 plan is Jacqueline entitled to reap the benefit (viz. release of GMAC's lien) of permissible lien stripping

3

under § 506(a) and § 1322(b)(2)?[4]

Jacqueline urges me to follow a line of cases holding that a Chapter 13 plan may require an undersecured creditor to release its lien upon full payment of the allowed secured portion of its claim prior to plan completion and discharge.  See In re Rheaume, 296 B.R. 313 (Bankr. D. Vt. 2003) (discussed below); In re Castro, 285 B.R. 703 (Bankr. D. Ariz. 2002) (confirming Chapter 13 plan over creditor's objection to provision requiring creditor to release its lien on vehicle upon payment of allowed secured claim); In re Gray, 285 B.R. 379, 385-88 (Bankr. N.D. Tex. 2002) (finding nothing in Code that prevents Chapter 13 plans from containing "early" lien release provisions, court overruled creditor's objection to plan confirmation); In re Townsend, 256 B.R. 881 (Bankr. N.D. Ill. 2001) (finding support in purpose of Code in allowing confirmation of plan that contained "early" lien release provision); In re Shorter, 237 B.R. 443 (Bankr. N.D. Ill. 1999); In re Johnson, 213 B.R. 552 (Bankr. N.D. Ill. 1997); In re Nicewonger, 192 B.R. 886 (Bankr. N.D. Ohio 1996); In re Cooke, 169 B.R. 662 (Bankr. W.D. Mo. 1994).

GMAC points me to an opposing line of cases, holding that a secured creditor cannot be compelled to release its lien until a Chapter 13 debtor fully consummates her plan and receives a

---

[4]  Jacqueline posits that GMAC's obstinacy violates § 362(a), although she has yet to pinpoint the subsection of § 362(a) GMAC has tramped on.  Given that retaining the lien relates to *in rem* rights only, it cannot constitute proscribed action against *the debtor*.  See Pratt v. General Motors Acceptance Corp. (In re Pratt), 324 B.R. 1 (Bankr. D. Me. 2005), *aff'd*, No. CIV 05119PC, 2005 WL 1961341 (D. Me. Aug. 15, 2005).  Under the terms of Jacqueline's plan, however, pre-confirmation estate property "remains property of the estate subject to the Court's jurisdiction, notwithstanding 11 U.S.C. § 1327(b)."  Order confirming plan at Part I, sec. I, dated August 20, 2003, dkt. no. 15.  But, even though the Voyager remains property of the estate, mere retention (as opposed to enforcement) of the lien would not seem to violate the automatic stay, either.  If one puts aside Jacqueline's § 363(h) damages prayer, her action might accurately be characterized as one to enforce the terms of a confirmed plan.  The difference is not important, as the parties have asked only that, for now, I address issues of liability.

4

discharge. E.g., In re Day, 292 B.R. 133 (Bankr. N.D. Tex. 2003) (recognizing that two prior cases from Northern District of Texas reached opposite results, following Thompson in sustaining creditor's objection to confirmation of plan that proposed to require secured creditor to release its lien prior to discharge); In re Moore, 275 B.R. 390 (Bankr. D. Colo. 2002) (holding that debtor must complete all payments under confirmed plan before receiving benefit of modification of secured creditor's claim); In re Thompson, 224 B.R. 360, 366 (Bankr. N.D. Tex. 1998) (finding support in Bankruptcy Code and Rules for proposition that Chapter 13 plan is akin to "'new contract'" between debtors and creditors, and concomitant requirement that debtors complete their obligations before they may enjoy benefits bestowed on them by the Code); McDonough v. Plaistow Cooperative Bank (In re McDonough), 166 B.R. 9, 14 (Bankr. D. Mass. 1994) (in dicta, recognizing that "lienstripping should only be accomplished through the Plan itself, which does not provide a benefit to the Debtor *until* the Debtor obtains a discharge . . . and it is certain that the case will be neither dismissed nor converted"); Gibbons v. Opechee Distributors, Inc. (In re Gibbons), 164 B.R. 207, 208 (Bankr. D.N.H. 1993).

    This is a prickly issue. See Day, 292 B.R. at 136 ("The court is convinced that a provision requiring a lien release prior to plan completion and discharge is inconsistent with the Code, admitting, however, that the precise basis for this conclusion is uncertain."). However, I need not enter the briar patch this day.[5]

---

[5] The debate is now largely academic, at least with respect to cases filed after October 17, 2005. In the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Congress sided with those courts that have found it impermissible for debtors to require secured creditors to release their liens prior to plan completion and discharge. E.g., 11 U.S.C. § 1325(a)(5)(B)(i) (Chapter 13 plan must provide that holder of an allowed secured claim retains its lien until the earlier of "the payment of the underlying debt determined under nonbankruptcy law," or discharge); 11 U.S.C. § 348(f)(1) (in case converted from Chapter 13, notwithstanding a

Even if I agreed with Jacqueline that the debtors could, through their plan, require GMAC to release its lien upon payment in full of GMAC's allowed secured claim, the language of their plan, together with that of their claims allowance/disallowance motion,[6] is insufficiently clear and conspicuous to have put GMAC on notice that it would be required to release its lien before its contract claim was paid in full. See In re Woods, 257 B.R. 876, 878 (Bankr. W.D. Tenn. 2000) (Chapter 13 debtor may not obtain order requiring secured creditor to release its lien prior to discharge "absent mandatory release language in the confirmed plan"). I agree with Judge Brown's assessment in Rheaume, that to effectively require a lien release upon payment of the allowed secured portion of a bifurcated claim, but prior to plan completion and discharge, the operative terms of the plan must articulate the requirement "in a way that is clear, conspicuous and consistent with the Bankruptcy Code." Rheaume, 296 B.R. at 322. Rheaume held the following language lacking:

> Creditors holding secured claims shall retain their liens only to the extent of their allowed secured claims. To the extent that the allowed secured claim is paid during this case or thereafter, such creditors' lien shall be reduced. Once an allowed secured claim has been paid in full, either during or after the pendency of this case, the creditor holding such claim shall promptly mark any lien securing such claim as satisfied in the appropriate public records.

Rheaume, 296 B.R. at 321-22. Judge Brown considered that the language "blur[red] the line

---

determination of the amount of an allowed secured claim in the Chapter 13 case, secured creditor retains its lien until the full amount of the claim as determined under nonbankruptcy law is paid).

[6] No language that would purport to require GMAC to release its lien prior to discharge appears in the debtors' plan or the order confirming it. The language Jacqueline seeks to enforce here appears in her motion to allow and disallow claims. Functionally, it is as though it appeared in the plan. Together, the plan and the claims allowance motion serve to define the final terms of the Chapter 13 plan. See supra n.3.

between what part of the lien release language deals with payments made through the plan and what part deals with payments made outside the context of the chapter 13 case." Id. at 322.  She stated that, if an "early lien release" term was to be effective, it must specifically identify the creditor(s) whose lien(s) are targeted and must be demonstrably set apart from standard plan boilerplate.  Judge Brown ordered the confirmation hearing reopened, to allow the debtor an opportunity to reformulate his lien release language.  Id.; see also In re Day, 292 B.R. at 134 (denying confirmation on grounds other than the *notice* provided by plan's language; but as example of lien release language: "the liens on the collateral . . . shall be released when the lesser of the stated value of the collateral or the allowed amount of the claim has been paid in full.").

    Here we are not concerned with confirmation.  Jacqueline has a confirmed plan.  She wants GMAC to answer for refusing to abide by that plan.  The language Jacqueline cites as mandating that GMAC release its lien states: "Secured Claims. . . . Upon payment in full of the allowed amount and any applicable interest, the creditor's security interest is deemed satisfied in full."  It appears at the end of a multi-sentence paragraph dealing generally with all secured claims.

    Jacqueline suggests that the language in her claims allowance/disallowance motion and the resulting order "implied that GMAC could not retain its lien once the secured portion of its claim was repaid."  (Emphasis added.)   But the passage she refers to is buried in boilerplate and is far from clear.[7]  A lien release requirement such as this one, if it could be valid at all, must be express, not left to implication.  Because Jacqueline's plan's language fails to provide minimally

---

[7]    Among other things, it does not identify the Voyager or GMAC specifically, and it fails expressly to provide that the lien on Lantz's interest can or will be affected.

sufficient notice to GMAC that its lien was targeted by an early release provision under Jacqueline's plan, I conclude that GMAC's lien is not subject to a pre-plan completion release requirement. Its refusal to release the lien is, to date, entirely lawful.

**2. The Order Granting Debtors' Motion to Sell.**

In September 2004, the debtors filed their sale motion, citing § 363(b) and Fed. R. Bankr. P. 6004(c). The motion alleged that consent of a lienholder was not required because the sale amount exceeded GMAC's allowed secured claim and, in any event, GMAC was expected to have been paid its entire allowed secured claim "by the time this motion is heard." An order granting the sale motion entered on November 1, 2004.

Jacqueline contends that GMAC's refusal to release its lien after the sale order's entry also constitutes a violation of the stay.[8] GMAC counters that, regardless of (i) the bankruptcy case, (ii) the Chapter 13 plan and the order on the motion to allow/disallow claims, and (iii) the sale order, nothing the debtors have done has even purported to affect GMAC's lien vis-a-vis Lantz, the Voyager's nondebtor co-owner.[9] As a result, GMAC says it is entitled to retain its lien until such time as Lantz's contractual obligation to it is discharged in full.

Surely, the sale order authorized Jacqueline to sell her interest in the car, free and clear of GMAC's lien. It does not follow, however, that that authorization requires GMAC to release its lien in a case such as this where a non-debtor remains liable on the debt.

In In re Leonard, 307 B.R. 611 (Bankr. E.D. Tenn. 2004), a Chapter 13 debtor jointly

---

[8] Again, exactly how § 362 is implicated is unclear. See supra n.4.

[9] Throughout, Lantz's interest, and the lien upon it, were never expressly mentioned. Surprisingly, Jacqueline did not even serve Lantz with the sale motion.

owned a vehicle with a non-filing co-debtor. Leonard, 307 B.R. at 612. The debtor's Chapter 13 plan provided for full payment of the lien creditor's allowed secured claim and a dividend of less than 100% on its unsecured claim. Id. Following completion of the plan, the debtor received a discharge, and the lien creditor was left with a deficiency balance of $3,328.64. Id. After the case closed, the debtor moved to reopen so she could move against the lien creditor for violating the discharge injunction by refusing to release its lien. The bankruptcy court determined that the lien creditor had done nothing wrong - it was under no obligation to release its lien until it was paid in full on its claim against the non-filing co-debtor. Id. at 614. Recognizing the protections afforded co-debtors during the pendency of a bankruptcy case, the court nonetheless found that nothing in the discharge injunction of § 524 prevented the lien creditor from asserting its rights after the bankruptcy case closed, where the non-debtor co-owner had continued personal liability secured by the lien. Id.

And so it is here. GMAC cannot collect from Lantz during the pendency of the bankruptcy, but, until it is paid in full it has no obligation to release its lien. See In re Harris, 199 B.R. 434, 438 (Bankr. D.N.H. 1996) (recognizing that creditor's personal and *in rem* claims against non-filing co-debtor are not affected by Chapter 13, except by the co-debtor stay); 5 William L. Norton, Jr. *Norton Bankruptcy Law and Practice 2d* § 118:5 (1997 & Supp. 2005) (secured creditor's right to collect debt from non-debtor third party endures unless debt is fully paid through Chapter 13 plan). Jacqueline's exertions here have the force of one hand clapping.

In other words, so long as there remains the possibility of personal liability on behalf of a record owner of the vehicle, GMAC is within its rights in retaining its lien. Of course, she remains free, within the terms of the sale order, to sell her interest in the Voyager to anyone

willing to pay for it.

**3. The Notices of Intent to Report Negative Credit.**

The facts pertinent to this issue: (1) on December 15, 2004, GMAC sent Jacqueline and Lantz each a Notice of Intent to Report Negative Credit; (2) prior to December 15, 2004, GMAC reported on both Brooks's and Lantz's credit reports that the balance due under the retail installment sale contract was written off effective May 27, 2003; (3) GMAC is aware of no notations made to either Jacqueline's or Lantz's credit reports with respect to the contract after December 15, 2004; and (4) federal nonbankruptcy law requires GMAC to provide notices to its customers when it reports "negative information," as that term is defined by statute. See e.g., 15 U.S.C. § 1681s-2(7)(A)(i) (financial institution that furnishes negative information to a consumer reporting agency *shall* provide written notice that it has done so to consumer) (emphasis added).

Although Jacqueline's argument is not crystalline, she apparently contends that issuing the notices, but not subsequently reporting negative information, taken together with lien retention, creates the inference that GMAC was impermissibly attempting to collect ("encourage" payment) the car loan.

Section 362(a)(6) protects debtors from "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case . . . ." Without question, "[c]oercive, threatening, or harassing statements . . . can violate the automatic stay." Jennings v. Town of Greene (In re Jennings), 304 B.R. 8, 11 (Bankr. D. Me. 2004); see Diamond v. Premier Capital, Inc. (In re Diamond), 346 F.3d 224, 227-28 (1st Cir. 2003) (threat that creditor might complain to state real estate commission (where debtor was licensed broker) if objection to discharge complaint did not settle in creditor's favor "could be found to be coercive by a trier of

10

fact"); Jamo v. Katahdin Federal Credit Union (In re Jamo), 283 F.3d 392, 402 (1st Cir. 2002) (creditor threats of immediate action, such as foreclosure or lawsuit, may violate automatic stay).

Section 1301(a), the codebtor stay, prohibits a creditor from acting to collect any part of a consumer debt from a person that is liable on the debt with a Chapter 13 debtor. Its purpose is to protect the debtor, not the co-debtor. In re Humphrey, 310 B.R. 735, 737 (Bankr. W.D. Mo. 2004); 5 *Norton Bankruptcy Law and Practice 2d* § 118:5 (citing legislative history). But it is specifically designed "'to ensure that the creditor does not lose the benefit of the bargain.'" Id. (quoting H.R. Rep. No. 595, p. 123). "The creditor is delayed procedurally, but substantive rights against the codebtor are not affected by the codebtor stay." Id.

Jacqueline concedes that "[c]ourts have been reluctant to hold that legal notices required by law . . . violate the bankruptcy stay." Her complaint, then, is not so much that the notices were *sent*,[10] but rather that GMAC must have sent them in an effort to coerce payment in violation of the stay. In Jennings, I examined the language of a statutorily required notice that was sent to debtors to determine if it was "so coercive or harassing as to violate the stay." Jennings, 304 B.R. at 13. Despite the fact that the language in the notice sent in Jennings contained the phrases "Do not disregard this notice. You will lose your property unless you pay" and "payment of the said tax is hereby demanded of you within thirty (30) days from the date of these presents," I ruled, taking into account the immediacy and context of the threatened action (as well as the relevant statutory scheme), that the town did not violate the automatic stay. Id. at

---

[10] The language of the notices ("We have told credit bureaus about a late payment, missed payment, or other default on your account. This information may be reflected in your credit reports. This is not a collection notice.") is hardly threatening. According to GMAC, it is copied directly from a model notice published by the Federal Trade Commission.

13 (quoting Diamond, 346 F.3d at 227).

The language in the notices sent by GMAC is not, in and of itself, harassing or coercive. There is no demand for payment. To the contrary, the notices specifically state they are not "collection" notices. They merely convey information, making no request that the recipient *do* anything. Moreover, they were sent pursuant to federal law, under a scheme designed to protect consumers by letting them know when negative reports are made to credit reporting agencies. Accordingly, and taken together with my earlier conclusion that GMAC's lien retention was lawful, I cannot conclude that issuing the notices violated either § 362(a) or § 1301(a).[11]

## Conclusion

For the reasons set forth above, judgment will enter for the defendant, GMAC. A separate order consistent with this opinion will enter forthwith.

| April 10, 2006 | /s/ James B. Haines, Jr. |
|---|---|
| Date | James B. Haines, Jr.<br>U.S. Bankruptcy Judge |

---

[11] Count II of the debtors' complaint seeks a *turnover* of a lien release from GMAC pursuant to § 542(a). Putting aside the very real question whether a lien release constitutes "property" subject to turnover within the meaning of § 542, I have already determined that GMAC is not yet under any obligation to release its lien in the vehicle.